IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

| | | |
|---|---|---|
| KAREN ANNE BRIGGS, | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | |
| LAGRANGE ART MUSEUM, INC. | ) | |
| CINDY FULKS, LEIGH NEWMAN, | ) | **Jury Trial Demanded** |
| HOLLY WINNER, LAURA JENNINGS, | ) | |
| LAUREN OLIVER, ETHYL AULT | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |
| _____ | ) | |

## CIVIL COMPLAINT AND DEMAND FOR JURY TRIAL

COMES NOW Plaintiff, Karen Anne Briggs, and brings this action as against LaGrange Art Museum, Inc., hereinafter designated and referred to as "LAM," Cindy Fulks ("Defendant Fulks"), Leigh Newman ("Defendant Newman"), Holly Winner ("Defendant Winner"), Lauren Oliver ("Defendant Oliver), Laura Jennings ("Defendant Jennings"), and Ethyl Ault ("Defendant Ault") and for cause shows as follows:

INTRODUCTION

1.

Plaintiff Karen Anne Briggs brings this action as against LaGrange Art Museum, Inc., hereinafter designated and referred to as "LAM," for violations of

the retaliation provisions of the Federal False Claims Act, 31 U.S.C. § 3730(h)

"FCA", for retaliation against her as an employee who disclosed or made efforts to

stop a false claim against the United States Government, thereby breaching her

employment contract and terminating her.  The individual defendants, and each of

them, are related persons whose interests were affected by their improper use of

taxpayer funds, and who engaged, or conspired to engage in, a concerted campaign

to slander Plaintiff and interfere with her employment contract, directly

contributing to her discharge from employment.

JURISDICTION AND VENUE

2.

This Court has jurisdiction over the subject matter of this complaint pursuant

to 28 U.S.C. § 1331, because this is an action arising under the laws of the United

States, specifically, the FCA, 31 U.S.C. § 3730(h).

3.

This court may exercise supplemental jurisdiction pursuant to 28 U.S.C. §

1367, as they are anchored to Plaintiff's claim in this action over which federal

jurisdiction is appropriate, and are so related to claims in the action within such

original jurisdiction that they form part of the same case or controversy.

4.

Venue in this district is appropriate pursuant to 28 U.S.C. § 1391 because it is the judicial district where Defendants committed the unlawful employment practices and retaliation, and because Defendants may be found in this District Defendant LAM's headquarters is located here.

PARTIES

5.

Plaintiff is a resident of Shiloh, Harris County, Georgia.

6.

LAM is a Georgia non-profit corporation, established, operated by a Board of Governors and executive staff, and headquartered in LaGrange, Northern District, Georgia. Defendant LaGrange Art Museum, Inc. may be served with process through its registered agent: Andy Porter, 112 Lafayette Parkway, LaGrange, Troup County, Georgia 30240.

7.

Defendant Fulks is a resident of LaGrange, Troup County, Northern District, Georgia and may be served at her residence: 1022 Peninsula Drive, LaGrange, Georgia.

8.

Defendant Newman is a resident of LaGrange, Troup County, Northern District, Georgia and may be served at her residence: 1102 Country Club Drive, LaGrange, Georgia.

9.

Defendant Winner is a resident of LaGrange, Troup County, Northern District, Georgia and may be served, upon knowledge and belief, at her residence: 1515 Hogansville Road, Apt. 26, Lagrange, Georgia.

10.

Defendant Oliver is a resident of Griffin, Spalding County, Northern District, Georgia and may be served at her residence: 719 Sherwood Drive, Griffin, Georgia.

11.

Defendant Jennings is a resident of LaGrange, Troup County, Northern District, Georgia and may be served at her residence: 114 Sunny Point Circle, LaGrange, Georgia.

12.

Defendant Ault is a resident of LaGrange, Troup County, Northern District, Georgia and may be served at her residence: 441 Gordon Circle, LaGrange, Georgia.

PROLOGUE

13.

In 1978, the Callaway Foundation donated the historic former Troup County

jail building to the Chattahoochee Valley Art Association (CVAA), the artistic

foundation of the LaGrange Art Museum.

14.

The CVAA occupied the building from 1978 to 1990 when the board voted

to change the name along with the mission and become a museum, the

Chattahoochee Valley Art Museum (CVAM).

15.

In 2007, the name changed to LaGrange Art Museum (LAM).

16.

In 2007, West Point Stevens Foundation and Callaway Foundation funded

the development of the Center for Creative Learning, a facility designed to house

educational programs.

17.

Thereafter, the Center for Creative Learning provided permanent space for

teaching children, adults and teachers and serves as a community meeting point.

18.

The remodel was not sufficient to meet required health and safety standards such that public funding sources were not available until 2014 when Plaintiff initiated a capital campaign, that included authorship of a number of Grants to be received from federal, state and local government, together with private foundation and corporate enterprise.

19.

All federal and state grants are written, and mandated, to serve the widest and most diverse community possible.

20.

Operations began receiving significant funding from The National Endowment for the Arts (federal), the Georgia Council for the Arts (largely federal pass-through funds) and some contribution from the LaGrange Housing Authority, partly federal.

21.

In addition to grants from government, the LAM receives private contributions and substantial funding through foundation enterprises.

22.

The LAM has borrowed significantly in the past.

23.

By 2011, LAM was $200,000 in debt, not including about $65,000 in employee withholding (Form 941) taxes, a potentially criminal breach and misuse of Federal Trust funding.

FACTUAL ALLEGATIONS

24.

The Board of Governors of LAM made a strategic hire calculated to develop an operating strategy for the failing museum to effect a corporate turnaround resulting from poor management by its directors and employees.

25.

At that time, LAM owed the Internal Revenue Service approximately $65,000 in employee withholding taxes set forth in ¶ 23, *supra*, with operating deficits totaling approximately $200,000 per year, and increasing by about $50,000 per year.

26.

In May, 2011, Plaintiff, through an arrangement with her consulting company and alter ego, Briggs Development, LLC, entered into a contract with LAM to provide consulting services.

27.

In the past six years, Plaintiff worked to reorganize inventory practices, pay current and delinquent receivables, procure exhibitors, secure property, write grants to obtain funding from taxpayer and private resources, *inter alia*, the National Endowment for the Arts, and to gain federal funding grants, which the state of Georgia matched, as well as funds from individual donors and private foundations. She contracted artists and rented facilities, partially constructed with taxpayer funding.

28.

Plaintiff gradually was promoted to interim acting consulting director then to acting director and finally director. New contracts variously extended the relationship between LAM and Briggs Development, LLC from May 18, 2011-May 14, 2012, and then again through the end of 2012.

29.

Then on or about January 1, 2013, Plaintiff was contacted through Briggs Development, LLC to commence the journey to Executive Director of the Museum for a period of three years.

30.

In January, 2015, until termination on July 14, 2017, the relationship between Plaintiff and LAM changed under the direction of the President of the

Board of Governors, and Plaintiff's status was converted to that of full-time

salaried employee.

31.

During the period leading to the full-time salaried contract governing the

parties' relationship at the time of termination, unfortunately, Plaintiff uncovered

conversion of tax dollars received, *inter alia,* from the National Endowment for

Arts (NEA), and other sources of federal funds, to serve the private interest of

present and past Governors and their associates.

32.

During the time Plaintiff had worked as Interim Executive Director, she was

not provided a job description, performance expectations, a review process, hourly

work requirements, paid leave or sick time.

33.

Functionally, Plaintiff had developed her own job description from known

requirements while she was contracting with the Board of Governors.

34.

In the Fall of 2016, LAM re-wrote its by-laws and included a provision for

(ratified) the hiring of an Executive Director.  The new by-laws were passed in

November, 2016, spelling out the duties, compensation, reporting and review

process, as well as the process through which the Board of Governors could hire or fire the Director, along with severance.

35.

The Board voted unanimously in favor of hiring Plaintiff and extending a contract.  In December, 2016, Plaintiff's salary, benefits and severance package were approved by the full board as part of the annual budget process for 2017.

36.

Plaintiff was Executive Director of LAM.  Plaintiff has experienced retaliation in connection with discharge from employment, directly and causally, related to her complaints that the organization was improperly misappropriating federal and state tax dollars favoring private interests of members of its Board of Governors and their associates, to wit:

a. The Cochran Gallery owned by Wes Cochran: Various exhibits were held at the Cochran Gallery, but paid for by the Museum, 2009 – 2013.

b. The LAM was overstating expenses, such as telephone and burglar alarm monitoring, insurance, artist travel, *inter alia*, for which the Cochran Gallery was receiving direct benefit in an amount approximating $2,000 per month.

c. The Center for Creative Learning Remodel: Beginning in 2014, and continuing through April, 2015, certain items were double billed or

omitted from the contract.  There were numerous erroneous bills and

overcharges, which were disputed.  The architect hired by Batson Cook,

the general contractor, told Plaintiff that LAM would have to "take a hit

for the team" for $7500, a plumber did not pay his subcontractors.

Plaintiff asserted legal implications and professional liability. That sum

was not paid twice but fell back on LAM.  Defendant Newman, a LAM

Board of Governor's member, and married to the project manager, was

incensed by the refusal.  The project had continued through April, 2015.

d.  Defendant Leigh Newman, victimized by Plaintiff's revelation of false

claims against the employer of her husband, told Steve Griffin, Treasurer,

that Plaintiff had falsely recorded financial information in the records of

LAM.[1] Her husband, Batson Cook Contractor, Frank "Chunk" Newman,

insisted the Museum credit him for a $1,000 donation to the Boys and

Girls Club.  Plaintiff pointed out to the Committee this would result in a

false claim and was illegal.

e.  Contemporaneously, Plaintiff complained that $10,000 for a water

abatement project was paid from Callaway Foundation *and* LAM from

dollars which included grants from a variety of sources including the

---

[1] The source of her "belief" was rooted in ignorance of financial accounting, and her articulated concern that LAM could not be profitable, because it never had been (while her husband, Cochran and others were self-dealing, double-billing and behaving poorly with the funding of LAM's efforts).

NEA, GCA, and City of LaGrange, totaling $53,000 through calendar year 2014.  In 2015 there was $139,000 in public source funding.

f.  Use of the Center for Creative Learning: The contract associated with several public source grants for the remodel provided that its purpose was to serve the community, particularly the underserved community.  In compliance with grant specifications, Plaintiff caused to be prepared leases for studio space to local artists. This was a permissible use of the open-space concept envisioned in the grants associated with funding of the project, and,

1.  Five local women leased space totaling about a third of the creative learning center area.

2.  These tenants included Defendant Cindy Fulks, Sandy Cox, Dawn Douglas, Gail Grice and Guthrie Killebrew.

3.  Dawn Douglas, a realtor, negotiated the leases for LAM space and was intimately familiar with their provisions.

37.

The building housing the Center for Creative Learning was laid out architecturally so that it could be an open space.  The bathrooms, the kitchen and hallways were for open space and common use.  There were individual offices, but the kitchen and sinks were shared purposes. That provision was structured into

federal grant applications authored by Plaintiff.  That was the purpose for which it was funded.

38.

However, once it was open, the tenants, led by Defendant Cindy Fulks, who were leasing the individual offices within the building itself, immediately began encroaching on public spaces and claiming them as their own.

39.

The tenants then claimed that 2/3 of the building area was theirs and that they should have exclusive use of the kitchen and the hallways.

40.

Notwithstanding specificity in the negotiated leases, the tenants demanded that a special sink be built because they expressly forbade the public from washing artistic paint brushes in "their" sink.

41.

The tenants, including Dawn Douglas and Defendant Fulks, also a realtor, accused Plaintiff of misrepresenting the leases; they said they never read the lease. The tenants, including Dawn Douglas who negotiated the leases, and knew that they were presented to federal funding sources, claimed that after they read the back page, Plaintiff ripped up the middle and forged deceptive and fraudulent

language provisions in the lease, and lied to them initially, telling them that the Center for Creative Learning space was exclusively theirs.

42.

The tenants demanded that LAM vacate its offices and give up storage. They wanted 2/3 of the building space intended by federal grant to serve the broadest diverse segment of the community, for their personal use.

43.

The tenants began complaining frequently to the Board of Governors about mistreatment by Plaintiff in her refusal to allow private parties the exclusive use and occupancy of public space, specifically to Defendant Newman, and then to President, Bobby Cammon.

44.

These tenants maintained strong and close relationships to persons and firms historically actively misappropriating federal funding.  By territorial takeover, the tenants, including Defendant Fulks, were misappropriating funds because they were seizing space intended for public or shared use for their exclusive use.

45.

The tenants then presented their complaints to H. Speer Burdette, President of the Callaway Foundation, a major contributor of funding and owner of the building housing the Center for Creative Learning.

46.

Plaintiff explained funding restrictions and complained that there was not liberty to change the leases to provide more exclusive use to the tenants of construction funded, in substantial part, by the National Endowment for the Arts and the Georgia Arts Council, which received about half its funding from federal dollars.

47.

Most importantly, the leases reflected the intentions of the funders in supporting the public use of the building.  The tenants were encroaching on, not just the real estate, but the purpose for which the funds were given.

48.

The tenants' express intent was to create a private space out of something that had been presented to the funders, including the Callaway Foundation, NEA, GCA and City of LaGrange, as public.

49.

Plaintiff repeatedly warned the Board of Governors' Appointed Special Construction Oversight Committee (Bobby Cammon, Jason Creel, Steve Griffin, and attorney David Fowler) and the executive committee, minus Leigh Newman, that personal beneficial use of federally funded projects, except as authorized by

grant, gave rise to fraud and rendered the application for and application of the funds a false claim.

50.

This was not a popular position for Plaintiff as it went against the grain of the intentions to deceive by the bad actors, including Fulks and Newman, and the pattern and practice of deception to which Defendant Newman (by way of her marital connection) was accustomed.

51.

Notwithstanding caveats from Plaintiff concerning source of funding, the Callaway Foundation commissioned new leases that gave the tenants 1/3 of the renovated space for their exclusive use and a share (commons) arrangement in a second third of the building.

52.

This act gave rise to false claims, because of the user. As the tenants were not acting as members of the general public and were not entitled to a one-half undivided interest in the middle third of the building and service area paid as exclusively for community interest and use for the broadest diverse population possible. Predictably, the tenants became territorially protective and aggressive about their perceived newly acquired entitlement.

53.

In conjunction with the above, individual Defendants, temporally proximate thereto, embarked upon a causally-related campaign of slander of Plaintiff in her trade, office, or profession, calculated to injure her therein as proscribed by O.G.G.A. § 51-5-4(a)(3), to wit:

a.   Board of Governors member, Ethyl Ault, told Bobby Cannon and Todd Stevens' wife that Plaintiff was engaged in a sexual liaison with Todd Stevens, a Board of Governors member, had given herself an unauthorized raise, had self-dealt with improper expenses, had falsified revenues and more.

b.   Defendant Cindy Fulks accused Plaintiff of stealing and damaging magazine covers of the Saturday Evening Post, on loan from her.  Not only did the covers on hand match the inventory list, but covers were sent to Atlanta for testing and no damage was found.

c.   Defendant Cindy Fulks, told board members that Plaintiff was misusing money and offered to pay $15,000 to have an unqualified audit of LAM finances.

54.

The animus attendant to Plaintiff's refusing to allow the museum's participation in furthering false claims continued, and then, at an Executive Committee meeting, April, 2016, Defendant Newman announced, "Cindy (Defendant Fulks, who was not even on the Board at the time, following expiration

of her second two-year term) and I have decided you should be fired and we have a letter stating that effective immediately, you are fired."

55.

Plaintiff reminded Ms. Newman (Board Treasurer) that as Executive Director, she did not report to her or to Ms. Fulks, but to the President, Mr. Cammon.  Plaintiff told her that she and Ms. Fulks had no authority to fire her, as retaliation for her complaints about use of the project or otherwise, and that if they tried she planned to consult an attorney.

56.

A short while later, Plaintiff was told by Mr. Cammon that members of the Executive Committee considered her intention to consult an attorney inappropriate and were disturbed by it.

57.

In February or March of 2016, a 'special called meeting' of the board took place to discuss the firing of Plaintiff.  There were not sufficient votes to effect that outcome.

58.

One immediate outcome of the meeting was that Plaintiff was no longer allowed to sign any contracts or authorize payment by checks, each of these would require two board signatures.

18

59.

Plaintiff complied and provided Mr. Cammon a list of over one hundred contracts, checks and e-checks, Plaintiff would not be signing.  The list included compliance reports to state and federal entities, the IRS, the National Endowment for the Arts, Georgia Council for the Arts.  All contracts with CPAs, banks, banking loan agreements, taxes and licenses.  She would not be signing service delivery contracts, such as those with the Callaway Foundation, other private foundation funders, the Junior Service League, LaGrange Housing Authority, City of LaGrange, Boys & Girls Clubs.  She would not sign exhibition and loan agreements with such as Columbus State University, the Springfield Museum of Art, or the Kohler Foundation.  She also would not be signing documents that acknowledged a tax contribution and IRS obligation, such as donations of cash or in-kind gifts, sale of artwork or camp or class registrations.  She listed internship agreements, staffing and teaching contracts for at least one dozen part-time teachers and technical program providers; as well as regular services providers such as insurance contracts, pest control, copier maintenance agreements or landscape and janitorial services, credit cards, web maintenance, or dry cleaning.

60.

In an Executive Committee meeting following this incident, Defendant Leigh Newman and Al Brannon accused Plaintiff of having maliciously and

deliberately stopped signing contracts and paying bills.  For example, the monthly

tax bill had not been paid, and that Plaintiff had deliberately not paid it.

61.

Defendant Newman and Brannon illogically maintained that an e-check, or

transaction, or even a signature on a credit card, was not a 'contract', but Plaintiff

reminded them that in today's electronic environment, virtually any signature, real

or virtual, could create a legal commitment.  Plaintiff had done exactly what was

asked of her.

62.

This decision to limit Plaintiff's duties was reversed three days later and

Plaintiff was once again allowed to sign checks and contracts.  The taxes were

paid.

63.

In May, 2017, Catharine Richert, Senior Reporter of Minnesota Public Radio

News, began research into misuse of funds at a Museum and became interested in

the possibility that federal funds may have been improperly deployed by the

LaGrange Art Museum during the tenure of former director, Megan Johnston.  Ms.

Richert spoke with Plaintiff, as well as current and past board members in

LaGrange about due diligence.

64.

Richert then released a story implicating several LAM board members and
Wes Cochran of the Cochran Art Gallery in LaGrange for improper benefit from
taxpayer resources.

65.

Anti-Plaintiff sentiments continued to fester and seethe as affected persons
began to coalesce toward the common end of removing (the *de facto*
whistleblower) Plaintiff from operations which had formerly inured to their
benefit.

66.

Beginning July 1, 2017, as approved by the Board of Governors in 2016,
Plaintiff entered into an individual employment relationship with LAM, subject to
the employment contract attached hereto as exhibit "A."

67.

When Plaintiff began her contract year on July 1, 2017, and at her firing on
July 13, 2017, the Board of Governors of LAM consisted of Andy Porter, Destin
Knowles Lemmo, Jason Creel, Jenni Sampson, Connie Boccucci, Al Brannon,
Ethyl Ault, Mike Burks, Martha Pirkle, Steve Griffin, Nanci Lechacz, Michael
McFalls, Jackie Terrail, Jackie Kennedy, Debbie Rand, David Fowler, Esq.,
Defendant Laura Jennings, Defendant Leigh M. Newman and Bob Cammon (ex

officio and non-voting).  Defendant Holly Winner was ex-officio and non-voting, as well.

68.

Plaintiff would normally be present at Board meetings, as she was present at the regularly scheduled Executive Board Meeting at 5 pm.  She was present at the subsequent regularly scheduled full-board meeting for July 13, 2017 at 6 pm.

69.

At neither the Executive or Full-Board meeting, was the employment status of Plaintiff discussed.

70.

Unknown to Plaintiff, Defendant Jennings, and upon knowledge and belief, Defendant Newman, had circulated proxies to members of the Board of Governors prior to the meeting for use at the meeting.

71.

The proxies were in blank.[2]

72.

At the conclusion of the regular meeting, Defendant Laura Jennings, board member, moved to go to executive session.

---

[2] Some board members later said that they were told that the purpose was to approve an audit of the LAM finances.

73.

Defendant Holly Winner, ex-officio non-voting member, seconded the
motion of Defendant Jennings.[3]

74.

Plaintiff and Bobby Cammon (immediate past-president) left the meeting as
neither were voting members.  Defendant Holly Winner did not leave, but
remained in the meeting.  The full membership of the board remained.

75.

As Plaintiff and Cammon were leaving the building, they observed five
individuals huddling in a darkened office, waiting to go into the board meeting.
They were Defendant Cindy Fulks, who was a tenant of CCL and former board
member, Sandy Cox (tenant), John Lawrence (College Art Gallery), Chris Joseph
(CPA), Lisa Hudson (LAM project co-chair), Janice Kish and Sally Keith, (mother
of Lauren Oliver).

76.

The Board of Governors' attorney, David Fowler, also a Board of Governors
member, was not in attendance.  The topic of the meeting had been unannounced
and there was no agenda.

---

[3] Winner was without authority to do so.

77.

Article VI § II of the document of governance of LAM, the structural basis

for which the LAM is entitled to enjoy federal exempt status pursuant to 26 U.S.C.

§ 501(c)(3) and state *ad valorem* taxation O.C.G.A. § 48-5-41, which provides,

*inter alia*, that special meetings may be called by the President, giving reasonable

notice to each governor personally.

78.

The majority of governors and the Board President, had no idea why the

executive session was called after the July 13, 2017 meeting, and it was not called

by the President, but, in part, instigated by Defendant Jennings and by a non-

member (Winner), engaging in adverse motion practice with no prior agenda.

79.

Article VIII § III provides, *inter alia*, that the President (Andy Porter), shall

provide *sole supervision and direction to the Executive Director*, <u>shall</u> attend all

meetings and have *sole responsibility for the agenda*.

80.

Article VIII § VI, provides that the Secretary, Jenni Sampson, shall be

responsible, *inter alia*, for maintenance of Board of Governors meetings as well as

LAM records.

81.

Physical and electronic LAM records would include records demonstrating evidence of false claims.

82.

On July 14, 2017, following the July 13 meeting after the meeting, Andy Porter, Laura Jennings and Jenni Sampson appeared in Plaintiff's office and told her that she had been fired.

83.

On July 17, 2017, as previously agreed, Plaintiff met the President at 10am. Plaintiff discovered that her office had been gone through, probably over the weekend.  Plaintiff's personal effects had been disturbed and Plaintiff was unable to determine what, if anything of value was missing, photographs, books and files had been removed.

84.

Plaintiff told the President who in turn called Lauren Oliver, staff member (and daughter of staff member Sallie Keith), who had access to the office key and Plaintiff's computer password.

85.

Oliver told the President that Plaintiff's files had been removed across the hall to the locked/art vault, but did not admit to knowing who had moved them or

gone through them during the weekend after acquiring the key from Oliver.  The
President went with Plaintiff to the vault to look for the missing files and personal
effects and they went through the files which were there.

86.

Lauren Oliver told President, Andy Porter, that several files had been
removed from Plaintiff's office, and in addition Plaintiff could show that files from
her computer had been deleted.

87.

A critical file, the documentation for overbilling by Batson Cook, was there
and Plaintiff went through the file and provided explanations to the President.

88.

Plaintiff then physically and personally handed the Batson Cook file to
President Porter.

89.

Plaintiff informed the President that two equally important files were
missing. (1) The record of negotiations with Dawn Douglas and Cindy Fulks and
the drafts and histories of the lease negotiations for the studio spaces, as well as
Plaintiff's comments and input on debates concerning those.  (2) Extensive
documentation and communications surrounding the Saturday Evening Post
Covers loaned to the Museum by Cindy Fulks.

90.

Plaintiff expressed significant concern over the loss of those documents, the potential for risk this posed to the museum and Plaintiff, and the loss of personal effects.

91.

By all articulated performance metrics, Plaintiff had performed in an exemplary manner.

92.

Plaintiff's severance negotiations yielded an agreement that she would be paid six months' salary or $37,500. (Exhibit B).

93.

Defendant LAM and its Board of Governors did not provide Plaintiff with two months' notice, but terminated her summarily, absent cause, and in bad faith; this was inconsistent with the parties' contract.

94.

Plaintiff's discharge was directly and causally related to exposure of Board of Governors members for deploying taxpayer benefits to the personal benefit of themselves and their associates.  They further realized that after exposure through public media, reporting the lack of accountability from them was capable of repetition by Plaintiff.

95.

The decision makers responsible for the adverse contractual action suffered by Plaintiff were totally aware of her engagement in protected activity within the ambit of 31 U.S.C. § 3730(h).

96.

Not only were they painfully aware of Plaintiff's protected expression, but they harbored deep-seated retaliatory animus for Plaintiff's participation in their loss of personal benefit of taxpayer resources.

97.

The level and breadth of the manifestation of retaliatory animus regarding Plaintiff, is more than sufficient to remove any speculation as to Defendants' intent.

COUNT I
31 U.S.C. § 3730(h)
FALSE CLAIMS ACT RETALIATION

98.

LAM, by and through its agents, Board of Governors members, Defendant Newman, Defendant Winner, Defendant Ault, Defendant Jennings, and Defendant Oliver engaged in concerted efforts to bring about or suborn false claims and retaliated against Plaintiff for complaining about the exposure and concern for future exposure to false claims act violations.

99.

Defendant Fulks, who was actively causing false claims to come about by her overreaching user for publicly funded space during and after her terms on the Board of Governors, retaliated against Plaintiff.  This was accomplished by teaming with Defendant Newman to tell Plaintiff that she was fired when neither had authority to do so, and appearing before an illegal meeting of executive session with fraudulently obtained proxy votes, to cause the firing of Plaintiff.

100.

In furtherance of the scheme of culpable Board of Governors members to retaliate against Plaintiff by discharging her, Defendant Laura Jennings and Defendant Leigh Newman, Board of Governors members, secretly contacted select Board Members concerning the firing purpose at the July 13, 2017 Board meeting, distributed blank proxies, moved for non-agenda executive session, seconded only by non-voting Holly Winner.[4]

101.

31 U.S.C. § 3730, The False Claims Act, prohibits individuals and companies from defrauding the federal government by making it illegal to submit claims for payment that involve certain kinds of deception or misrepresentation.

---

[4] Winner served a three-year term on the board and was serving as a non-voting ex officio member.  At some point before firing Plaintiff, she was self-installed as a Board of Governors member.

102.

Employees who work for government contractors, or other entities that receive government funds through Medicare/Medicaid, defense contracts, or other programs, perform a crucial public service on behalf of all taxpayers when they oppose fraud.

103.

31 U.S.C. § 3730(h) makes it illegal for employers to retaliate against employees who have opposed certain fraudulent activities.

104.

The anti-retaliation provision of the False Claims Act protects employees, contractors or other agents of a company from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer" because the employee, contractor, or agent investigated, reported or sought to stop a company from engaging in practices which defraud the United States Government.

105.

Plaintiff's efforts to stop false claims resulted in a conspiracy of the named Defendants to get her fired.

106.

Defendants knew that Plaintiff would continue to oppose efforts to commit *de facto* and *de jure* violations of the False Claims Act calculated to achieve private ends of Defendants, because she told them she would.

107.

A successful retaliation claim generally requires an employee to prove three elements: first, that the employee engaged in protected conduct; second, that the employer initiated an adverse employment action against the employee; and third that an impermissible relationship exists between the protected conduct and the adverse employment action. That is controlling law in the 11th Circuit.

COUNT II
BREACH OF CONTRACT

108.

In December, 2016, the Board of Governors of LAM voted to extend Plaintiff an individual contract of employment.

109.

In November, 2016, at the time of the unanimous approval of the contract, Defendants Fulks, Newman, Ault and Jennings were members of the Board of Governors of LAM.  Defendant Winner was not a voting member of the Board.

110.

In May, 2017, Plaintiff spoke with Catharine Richter concerning previous False Claims Act claims in which the LAM had been involved and the potential for false claims.

111.

On July 1, 2017, Plaintiff and Defendant LaGrange Art Museum, Inc. began to operate consistently with the unanimously approved extension of an employment agreement to Plaintiff, attached hereto as Exhibit "A". This implemented the contract awarded in December, 2016.

112.

At the time of its implementation on July 1, 2017, Defendants Ault, Jennings, and Newman were members of the Board of Governors of the LAM. Defendant Winner was still ex-officio and non-voting.

113.

The contract, on its face, contemplated a three-year durational term with increases in some benefits as determined by market. "Ms. Briggs will serve as Executive Director to the LaGrange Art Museum for a period of three years, beginning this 1st day of July, 2017 through the 30th day of June, 2020."

114.

The contract provided for, *inter alia*, a salary of $75,000 per year.

"Compensation of the Executive Director shall be approved by the Board of Governors within the annual institutional budget approval cycle. The LaGrange Art Museum agrees to pay Ms. Briggs, base compensation as outlined below:

During the period from July 1, 2017 through June 30, 2018: $3,125 paid twice monthly
During the period from July 1, 2018 through June 30, 2019: $3,125 paid twice monthly
During the period from July 1, 2019 through June 30, 2020: $3,125 paid twice monthly

Increases in compensation during the period of this contract may be considered by the Board of Governors as the Board deems appropriate within the parameters of the annual institutional budget approval cycle."

115.

The contract also provided, "The Executive Director is responsible for raising funds through *normal and legal methods*, to include private, corporate, and governmental and foundation sources for the purposes of meeting or exceeding the goals of the annual budget.

116.

The "normal and legal" methods of obtaining government and foundation dollars had previously impermissibly included their application to servicing private interests of Board members and their business and social associates as set forth herein.

117.

Finally, the contract addressed the subject of termination:

"Termination of this contract may be made by either party with sixty (60) days' notice. Should the Executive Director resign of her own accord, she shall make all reasonable efforts to complete incomplete tasks and transfer work to staff. Removal of the Executive Director shall require a majority plus one of the entire Board of Governors. A severance package shall provide for a buyout equal to four months of the Executive

Director's annual salary and shall take effect should the contract be terminated or not renewed by the Board. The buyout shall not include any other perks, benefits, or taxes and shall require a 1099 for tax purposes. The buyout does not apply should the Executive Director resign of his/her own accord."

## 118.

A duty of good faith and fair dealing is implied in every contract, however, and the notice provision in the parties' contract does not render the employment of Plaintiff at-will.

## 119.

Prior to the full-time employment contract, commencing July 1, 2017, Plaintiff served LAM as Executive Director performing under a consulting contract with her company from 2011-2015.  Plaintiff converted to employee status, without contract, January 1, 2015.

## 120.

That arrangement, though not specifically referenced or prohibited, allowed time for Plaintiff to engage in other consulting contracts through Briggs Development, LLC.

## 121.

Plaintiff contemplated giving exclusive time and services to LAM in return for the opportunity to grow the LaGrange Art Museum and the security associated with the benefits afforded.

122.

Plaintiff had met or exceeded all performance metrics and suggestions during the five years prior to the vote to extend her a contract in 2016, effective January 1, 2017, but not fully executed until July, 2017.

123.

The arrangement inured to the benefit of both parties.

124.

Plaintiff had materially changed her position after the unanimous approval of the contract extension in December, 2016.

125.

Plaintiff had done nothing whatever to breach the terms of this contract or behaved in any manner that would, in good faith, justify its breach by Defendant LAM.

126.

In so doing, LAM has further ratified the actions of its Board of Governors, members and associates in their continuing efforts to retaliate against Plaintiff for exposing, addressing, complaining and acting to prevent false claims by LAM.

COUNT III
INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS

127.

Exhibit A establishes a definite term of employment of three years.

128.

LAM, by the actions of its agents, is liable for breach of the employment contract.

129.

Defendant Holly Winner was not a Governor, except in her own mind as self-appointed, when she directly took illegal action to interfere with Plaintiff's contract of employment at the July executive session after the Board of Governors meeting.

130.

Defendant Cindy Fulks was not a Governor when she directly took illegal action to interfere with Plaintiff's contract of employment at the July executive session after the Board of Governors meeting, after huddling in the dark awaiting summons to perform testimony.

131.

The employment agreement between Plaintiff and LAM, while terminable with appropriate notice, was a valuable contract right, which may not be unlawfully interfered with by a third person without such authority.

132.

The actions of Defendants Fulks and Winner to cause termination of Plaintiff's employment, in retaliation for Plaintiff's insistence that her employer

refrain from making or causing false claims, were designed to cause exactly the harm that obtained for Plaintiff.

### 133.

Neither Fulks nor Winner had individual authority to discharge Plaintiff, they were not Board of Governors members and would have lacked individual authority had they been.

### 134.

The instigation of Defendants Fulks and Winner, activated by an unlawful scheme or purpose to injure and damage Plaintiff, was maliciously and unlawfully designed to persuade LAM to breach the contract with Plaintiff.

### 135.

LAM did breach its contract with Plaintiff, and Plaintiff suffered serious economic and non-economic harm thereby, to wit:

a. Plaintiff suffered delimited earnings that would have flowed from payment by LAM for services under the contract;

b. Plaintiff suffered loss of $12,535.92 allowance for health insurance benefits;

c. Plaintiff suffered loss of $1,200.00 per year health savings account;

d. Plaintiff suffered loss of a four-week per year vacation benefit; and

e. Plaintiff has suffered loss of professional reputation and esteem.

136.

Plaintiff's contract, on its face, was contemplated by the parties to have a duration of three years.  To breach is to treble the foregoing damages to account for three years, as she had not yet received the first salary installment of the contract authorized in December, 2016 and implemented July 1, 2017.

137.

Because of Defendant's violation of 31 U.S.C. § 3730(h), Defendant LAM is obligated to play Plaintiff twice the amount of lost back pay and benefits.

138.

Additionally, Plaintiff has suffered compensatory damages for the visitation upon her of anger, frustration, humiliation, fright, worry, inconvenience and mental anguish for which Defendants Fulks and Winner are liable over to Plaintiff in an amount not exceeding $250,000.

COUNT IV
SLANDER

139.

Defendant Ault told Bobby Cammon, Todd and Barbara Stevens, that Plaintiff was involved in an extra-marital love affair with Board of Governors member, Todd Stevens.

140.

Those statements were patently untrue and uttered for the sole purpose of causing Plaintiff embarrassment, harm to her reputation, and to undermine the confidence of the Board of Governors in the character and integrity of Plaintiff. Damage is actual and inferred.

141.

These statements were part of the general conspiratory scheme to cause retaliation against Plaintiff for actions taken and complained about in the interest of preventing false claims.

142.

Statements by Defendant Newman to Steve Griffin and Cindy Fulks that Plaintiff had misappropriated funds were false.[5]  Newman accused Plaintiff of constituting financial records by diverting records of public resources to effect a balanced budget.  If true, that would have brought about a false claim, but it was not true.  Damage is actual and inferred.

---

[5] These may have risen out of Newman's ignorance of non-profit accounting procedures, but were nonetheless slanderous. Newman was Board Treasurer.

143.

These statements were part of the general conspiratory scheme to cause retaliation against Plaintiff for actions taken and complained about in the interest of preventing false claims.

144.

Additionally, Plaintiff has suffered compensatory damages for the visitation upon her of anger, frustration, humiliation, fright, worry, inconvenience and mental anguish for which Defendants Fulks and Winner are liable over to Plaintiff in an amount not exceeding $250,000.

145.

Additionally, Plaintiff would be entitled to punitive damages for egregious, vexatious and burdensome misconduct of Defendants Fulks and Newman, either intentionally to cause harm, or totally devoid of concern for the harm caused Plaintiff.  Punitive damages are available in the amount of $250,000, though which taken in the aggregate, would not exceed $250,000

WHEREFORE, Plaintiff respectfully prays as follows:

 a.   That summons issue and Defendants be served as by law provided;

 b.   That Plaintiff have and recover of Defendant LAM all damages proven at trial for breach of contract and violation of 31 U.S.C. 3730(h), less efforts to mitigate;

c.   That Plaintiff have and recover against Defendants Ault and Newman damages as inferred from slander per se;

d.   That Plaintiff have and recover from Defendants Ault and Newman, most especially, compensatory and punitive damages not to exceed the statutory limit;

e.   That Plaintiff have and recover of Defendants Winner and Fulks, damages for third-party interference with her employment contract;

f.   That Plaintiff have and recover from Defendants Winner and Fulks, most especially, compensatory and punitive damages, not to exceed the statutory limit;

g.   That Plaintiff be awarded all costs of this action;

h.   That Plaintiff have a trial by jury; and

i.   That Plaintiff be awarded such other and further relief as unto which the court may deem just and equitable in the premises.

Submitted this 6th day of December, 2017.

/s/ John W. Roper___
John W. Roper
Georgia Bar No: 614159

The Roper Law Firm
233 Twelfth Street
Suite 602
Columbus, Ga 31901
Tel:  (706) 596-5353
Fax: (706) 596-5383
johnroper@roperlaw.com